277 F.3d 544 (D.C. Cir. 2002)
 Brenda Elaine Makins, Appellant
v.
District of Columbia and Francis J. Henderson, Acting Warden, D.C. Department of Corrections Central Facility, Appellees
 No. 01-7029
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 17, 2001
Decided January 18, 2002
 
 Appeal from the United States District Court for the District of Columbia (98cv02693)
 Gregory L. Lattimer argued the cause and filed the briefs for appellant.
 Carl J. Schifferle, Assistant Corporation Counsel, argued the cause for appellees. With him on the brief were Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel.
 Before: Henderson, Randolph, and Rogers, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Randolph.
 Dissenting opinion filed by Circuit Judge Henderson.
 Randolph, Circuit Judge:
 
 
 1
 This appeal from a district court order enforcing a settlement agreement presents an issue much litigated in the other circuits but not yet decided by this court--namely, under what circumstances, if any, may an attorney without actual authority from his client bind the client to a settlement agreement. We must also decide whether to look to state or federal law in answering this question.
 
 I.
 
 2
 In November 1998, Brenda Makins brought an action against the District of Columbia claiming sex discrimination and retaliatory firing, in violation of Title VII (42 U.S.C. 2000e et seq.). Makins had been employed in the District's Department of Corrections from 1995 until her discharge in 1997. Her complaint sought reinstatement, compensatory damages, and attorney fees.
 
 
 3
 Makins' attorney, John Harrison, began representing her in 1996, after she received a notice of termination from the Department. Harrison and Makins did not have a written retainer agreement. In the summer of 2000, at a pre-trial conference, the district judge referred Makins' case to a magistrate judge "for settlement purposes only" and ordered the District to "have present at all settlement meetings ... an individual with full settlement authority." The judge set the case for trial in December 2000. Makins v. Dist. of Columbia, No. CV-98-2693, mem. op. at 2 (D.D.C. Dec. 11, 2000). A few days later, the magistrate ordered the "lead attorney(s) for the parties" to appear before him for a settlement conference; the order required that the "parties shall either attend the settlement conference or be available by telephone for the duration of the settlement conference."
 
 
 4
 The conference, originally scheduled for August 22, took place on September 12, 2000. Makins did not attend. After two and a half hours of negotiations, Harrison and the attorneys for the District reached an agreement to end the case. Makins would receive $99,000 and have her personnel records amended from "discharged" to "resigned" (to preserve her retirement benefits if she were able to attain other federal employment). In return, Makins would dismiss her claims against the District. The attorneys "shook hands" on the deal and later reduced it to writing. A few days later, when Harrison presented Makins with a copy for her signature, she refused to sign it. The District then filed a Motion to Enforce Settlement. Makins retained another attorney and the court held an evidentiary hearing in which Harrison, Makins, and the lead attorney for the District testified.
 
 
 5
 The testimony of Makins and Harrison were at odds. According to Makins, she never agreed to settle her case under the terms Harrison and the District negotiated because "getting [her] job back had to be part of any agreement." She admitted wanting to settle the case and knowing that the correctional facility in which she had worked was downsizing. She claimed that Harrison waited until the night before the conference to alert her to it and specifically told her not to attend. She talked to Harrison several times during the settlement negotiations on September 12. But she insisted that she never agreed to the negotiated terms because, as she expressed to Harrison in one of their cell phone conversations that day, getting her job back was a condition to settling the case. Although Makins swore in an affidavit, filed before the hearing, that Harrison alerted her during the negotiations that he was discussing the $99,000 figure, she testified that she did not recall such a conversation.
 
 
 6
 Harrison disputed much of Makins' testimony. He said they had extensively discussed the possibility of settlement the day before the conference, that he discouraged her from insisting on getting her job back, that he thought it made sense strategically for his client to remain at home so that "the Judge couldn't put pressure on her to settle," that she gave him a number where he could reach her on September 12, and that she told him to do "what you think is right, I trust you." At the conference, each side presented its case separately to the magistrate. The attorneys and the magistrate then sat at a table and negotiations began. On several occasions, the magistrate sent one of the attorneys out of the room and talked to the other about what he saw as strengths and weaknesses in the case. By cell phone Harrison called Makins when he was out of the room. He contends that she agreed to settle for $99,000. Harrison testified that when the District agreed to this figure, he called Makins immediately and "told her that the 99 was done," to which she replied "good." Harrison also stated that Makins did not express any dissatisfaction with the settlement until several days later when she refused to sign the papers in Harrison's office.
 
 
 7
 The District's attorney generally confirmed Harrison's account of the conference (although he did not know what Harrison and his client had discussed by cell phone, or even if they had discussions). In response to the District's offer of approximately $80,000, Harrison said his client was still at $120,000, or thereabouts. The District's attorney replied that he would not settle the case for more than $100,000. Harrison left the room, cell phone in hand, and came back a few minutes later. He said $99,000 would be fine but his client wanted her records changed to show that she had resigned. The District reluctantly agreed. Neither the attorney for the District nor the magistrate spoke to Makins to confirm her assent to the terms of the agreement.
 
 
 8
 The district court, observing the "sharp conflict" in testimony between Makins and Harrison, declined to resolve it. Instead, the court assumed arguendo that Harrison did not have actual authority to settle the case. The court granted the District's motion to enforce the settlement on the alternative ground that Harrison had apparent authority to bind Makins to the agreement. The court saw "no justification for the District of Columbia not to reasonably believe that Mr. Harrison had the full confidence and authority of his client." Mem. op. at 7.
 
 II.
 
 9
 Settlement agreements are in the nature of contracts. See Gaines v. Cont'l Mortgage & Inv. Corp., 865 F.2d 375, 378 (D.C. Cir. 1989). As in other contract negotiations, one or both of the parties may insist that the terms be reduced to writing and that only a signed agreement will be effective. But not all contracts, and not all settlements, must be written in order to be enforceable. The parties may orally agree upon the material terms and intend to be bound. See United States v. Mahoney, 247 F.3d 279, 285 (D.C. Cir. 2001). "Lawsuits may, of course, be compromised by oral contract." Autera v. Robinson, 419 F.2d 1197, 1198 n.1 (D.C. Cir. 1969); see also Feltman v. Sarbov, 366 A.2d 137, 141 (D.C. 1976). The attorney for Makins and the District agreed upon essential terms. That Makins refused to sign the settlement papers is therefore not conclusive, a point she does not debate. The question is whether the oral understanding between the attorneys may be enforced against Makins-whether, in other words, she was bound by the deal her attorney negotiated.
 
 
 10
 The District urges us to adopt local law as the rule of decision. Makins thinks we should devise federal law: the case was brought in federal court; the cause of action is derived from federal legislation; and the actions of attorneys conducting federal litigation are of particular federal concern. Apparently for these reasons, some federal courts agree with Makins. See, e.g., Kinan v. Cohen, 268 F.3d 27, 32 (1st Cir. 2001); Malave v. Carney Hosp., 170 F.3d 217, 221 (1st Cir. 1999); Michaud v. Michaud, 932 F.2d 77, 79 n.3 (1st Cir. 1991); Fennell v. TLB Kent Co., 865 F.2d 498, 501 (2d Cir. 1986); Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386, 386 (5th Cir. 1984). Makins also cites Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 & n.15 (1974), for the proposition that federal law governs settlement agreements in Title VII cases. The Supreme Court, after saying that an employee could enter into a voluntary settlement and waive his cause of action under Title VII, added this: "In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing," 451 U.S. at 52 n.15, thus invoking the familiar test of Johnson v. Zerbst, 304 U.S. 458, 464 (1938). But this was dictum. The employee in Alexander had not entered into a settlement. An arbitrator had rejected his grievance charging racial discrimination. The Court was not concerned with settlement agreements in general, or with the authority of attorneys to enter into them. The issue before the Court was whether the labormanagement arbitration, conducted pursuant to a collective bargaining agreement, precluded the employee from bringing a Title VII action alleging the same conduct. The Court's remarks about settlements, contained in a footnote not citing any authority, can hardly be taken as representing its considered judgment that state law should not be adopted in Title VII cases. And we see no good reason why Title VII cases should be singled out for different treatment in this respect than other federal causes of action. Cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).
 
 
 11
 In any event, Makins has missed--as has the District--our opinion in United States v. Mahoney, 247 F.3d at 285. We there held that whether the parties have reached a settlement is a matter of local law. For this conclusion we cited and relied upon the decision in Quijano v. Eagle Maintenance Service, Inc., 952 F. Supp. 1, 3 (D.D.C. 1998), that the "enforcement of settlement agreements is governed by state contract law." There are good reasons behind this.
 
 
 12
 The power of the federal courts to formulate law in this area, and the need for national uniformity, are doubtful at best, as Judge Easterbrook forcefully demonstrated in Morgan v. South Bend Community School Corp., 797 F.2d 471, 474-78 (7th Cir. 1986). In fact, our survey of the law regarding settlements indicates that rather than national uniformity in the federal courts, there is national disarray. See generally Grace M. Giesel, Enforcement of Settlement Contracts: The Problem of the Attorney Agent, 12 Geo. J. Legal Ethics 543, 563-80 (1999). We agree that "neutral state laws that do not undermine federal interests should be applied unless some statute (or the Constitution) authorizes the federal court to create a rule of decision." Morgan, 797 F.2d at 475 (citing Miree v. DeKalb County, 433 U.S. 25, 2833 (1977)). There is also an advantage for members of the bar to know that in negotiating settlements, the law governing the validity of their agreements will be the same in federal and state court. Other federal courts of appeals agree. The Seventh, Eighth, Tenth, and Eleventh Circuits, and perhaps the Third, Fourth, and Ninth, now look to state law in determining if a valid and enforceable settlement agreement exists. See Pohl v. United Airlines, Inc., 213 F.3d 336, 338 (7th Cir. 2000); In re Airline Ticket Comm'n Antitrust Litig., 268 F.3d 619, 623 (8th Cir. 2001); United States v. McCall, 235 F.3d 1211, 1213 (10th Cir. 2000); Hayes v. Nat'l Serv. Indus., 196 F.3d 1252, 1254 & n.2 (11th Cir. 1999); see also Tiernan v. Devoe, 923 F.2d 1024, 1032-33 (3d Cir. 1991); Auvil v. Grafton Homes, Inc., 92 F.3d 226, 230 (4th Cir. 1996); Mallott & Peterson v. Director, Office of Workers' Comp. Programs, 98 F.3d 1170, 1173 (9th Cir. 1996). Aside from cases in which a settlement agreement is sought to be enforced against the United States, see United States v. Beebe, 180 U.S. 343, 352 (1901), or in which there is a statute conferring lawmaking power on federal courts, see Textile Workers v. Lincoln Mills, 353 U.S. 448, 451 (1957), we adopt local law in determining whether a settlement agreement should be enforced.
 
 
 13
 The local law on this subject is, unfortunately, not much developed. The District of Columbia Court of Appeals treats settlement agreements as contracts. See Goozh v. Capitol Souvenir Co., 462 A.2d 1140, 1142 (D.C. 1983). In run-of-themill contract cases, the D.C. Court of Appeals relies on 27 of the Restatement (Second) of Agency to determine whether an agent has the authority to enter into a binding agreement on behalf of the principal. See, e.g., Sigal Constr. Corp. v. Stanbury, 586 A.2d 1204, 1218 (D.C. 1991) (citing Restatement (Second) of Agency 27 (1958)). The local court distinguishes--as did the district court--between an agent's "actual authority" and his "apparent authority." Actual "authority," according to the Restatement's definition, means that the agent has the power "to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency 7. For settlement purposes, attorney Harrison possessed actual authority in certain respects. Makins manifested her consent to Harrison's attending the settlement conference on September 12, to negotiating on her behalf and, if her testimony is believed, to settling the case, but only on the condition that she got her job back.
 
 
 14
 We must assume arguendo--because the district court did so--that Makins never gave Harrison actual authority to settle the case without the condition she specified. Still, it does not necessarily follow that because the settlement agreement lacked that condition it cannot be enforced. As agents for their clients, attorneys without actual authority may have "apparent authority" to bind their clients to agreements. The local court has not, however, addressed the precise question presented here: may an attorney negotiating in the client's absence bind the client to a settlement agreement if the attorney has led opposing counsel to believe he had actual authority from the client to settle the case?
 
 
 15
 On the other hand, an opinion of the local court--not cited by the District and the only one we have found dealing with an attorney's authority to settle a case--holds that "regardless of the good faith of the attorney, absent specific authority, an attorney cannot accept a settlement offer on behalf of a client." Bronson v. Borst, 404 A.2d 960, 963 (D.C. 1979). On the face of it, the statement leaves no room for apparent authority. If this is the meaning of Bronson, the case is at odds with the same court's later pronouncement in Goozh that the enforcement of settlement agreements is governed by the law applicable to the making of contracts generally, and with its adoption of the Restatement position that an agent lacking actual authority may nevertheless bind the principal to an agreement with a third party if the agent has apparent authority. Bronson may be explained on the basis that the suit was brought by the attorney against the client to enforce the settlement in order to recover his contingent fee, and that at least as between an attorney and client, the court would not allow recovery if the attorney entered into the settlement against the client's wishes. This is consistent with 383 of the Restatement (Second) of Agency, although the court did not mention it. Bronson, unlike this case, did not deal with the interests of a third party who entered into the settlement with the attorney. The third party in Bronson, an insurer, was not named in the lawsuit. There was thus no occasion for the court to consider whether an opposing party could enforce a settlement agreement when the other party's attorney possessed only apparent authority.
 
 
 16
 Given the vintage of Bronson, the fact that the local court has never again relied upon the portion of the opinion quoted, the distinctions we have just mentioned, and the absence of any recent cases on point, the content of local law is so much in doubt that we are reluctant to take the statement in Bronson at face value. Makins herself concedes that if Harrison had apparent authority--as she views it--the agreement he negotiated could be enforced. Brief for Appellant at 14. We have therefore undertaken an analysis of whether Harrison had apparent authority, which puts us in the position of deciding--to borrow from Judge Friendly--what the local court would think on a question about which it has never thought. Nolan v. Transocean Air Lines, 276 F.2d 280, 281 (2d Cir. 1960).
 
 
 17
 Apparent authority may be defined as the "power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from, and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency 8; see Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 566-68 (1982). Apparent authority, according to the widely-accepted rule in the Restatement, can arise from "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [her] behalf by the person purporting to act for [her]." Id. 27. While actual authority depends on communications
 
 
 18
 between the client and the attorney--the principal and the agent--apparent authority under the Restatement turns on the client's communication to the third party, here the District of Columbia. As the D.C. Court of Appeals put it, "apparent authority is derived from the principal's representations to the third-party rather than to the agent." Sigal Constr. Corp., 586 A.2d at 1218.
 
 
 19
 Given the local court's adoption of the Restatement, and its willingness to look at treatises to establish the general rules of law pertaining to agency issues, see Insurance Management of Wash., Inc. v. Eno & Howard Plumbing Corp., 348 A.2d 310, 312 (D.C. 1975) (citing 3 G. Couch, Insurance 26:75 (2d ed. 1960) to establish the general rule for the apparent authority of an insurance agent), the local court faced with this issue might turn to the recently-issued Restatement (Third) of the Law Governing Lawyers to aid analysis. The Restatement of the Law Governing Lawyers parallels the Restatement of Agency's approach to authority: "A lawyer's act is considered to be that of the client in proceedings before a tribunal or in dealings with a third person if the tribunal or third person reasonably assumes that the lawyer is authorized to do the act on the basis of the client's (and not the lawyer's) manifestations of authorization." Restatement (Third) of the Law Governing Lawyers 27 (1998). To this the Restatement adds: "Apparent authority exists when and to the extent a client causes a third person to form a reasonable belief that a lawyer is authorized to act for the client"; and "Generally a client is not bound by a settlement that the client has not authorized the lawyer to make by express, implied, or apparent authority...." Id. cmts. b & d. It then offers the following illustration:
 
 
 20
 Lawyer represents Client in a civil action in which the court orders counsel to appear at a pretrial conference with authority to settle the case or to arrange for the presence of a person so authorized. Client has not been informed of the order and has not authorized Lawyer to approve a settlement. Lawyer, without disclosing that lack of authority, attends the conference and agrees to a settlement. Client is not bound by the settlement.
 
 
 21
 Id. 27, cmt. d, illus. 3. The reasoning behind this begins with the principle that certain decisions in litigation are the client's, and the client's alone to make. Like the decision to enter a plea of guilty or to pursue an appeal in a civil or criminal case, the decision whether to settle a case and on what terms is reserved to the client. Id. 22(1); see also D.C. Rules of Prof'l Conduct R. 1.2(a) ("A lawyer shall accept a client's decision whether to accept an offer of settlement of a matter."). As to settlements, the client therefore must manifest to the third party that his lawyer has the authority to compromise the case. If the matter is in doubt, third parties can protect themselves by "obtaining clarification of the lawyer's authority." Restatement (Third) of the Law Governing Lawyers 27 cmt. d. Settlements are thereby facilitated while the client's prerogatives are preserved.
 
 
 22
 The key here is that the client, not the lawyer, must indicate to the third party that the lawyer is authorized to act. We have applied this rule to attorney-client transactions in a context other than settlement, see Williams v. WMATA, 721 F.2d 1412, 1416-17 (D.C. Cir. 1983). But not all courts agree. The Sixth Circuit, interpreting Michigan law, held that "when a client hires an attorney and holds him out as counsel representing in a matter, the client clothes the attorney with apparent authority to settle claims connected with the matter." Capital Dredge & Dock Corp. v. City of Detroit, 800 F.2d 525, 529 (6th Cir. 1986). The Restatement (Third) of the Law Governing Lawyers treats this as a minority approach. The general rule, embodied in the decisions of other federal courts relying on both federal and state law, and a much-quoted passage from a Supreme Court opinion are against the notion that merely retaining a lawyer is enough for this purpose. See, e.g., Michaud, 932 F.2d at 80; Fennell, 865 F.2d at 502; Edwards v. Born, Inc., 792 F.2d 387, 390 (3d Cir. 1986); Auvil, 92 F.3d at 230-31; see also Autera, 419 F.2d at 1201 n.18; accord Woodson v. UPS, No. 91-C6452, 1993 WL 280759, at *2 (N.D. Ill. July 26, 2001); Evans v. Skinner, 742 F. Supp. 30, 31 (D.D.C. 1990); Ashley v. Atlas Mfg. Co., 7 F.R.D. 77, 77 (D.D.C. 1946), aff'd, 166 F.2d 209 (D.C. Cir. 1948). As the Supreme Court put it a century ago: "the utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed." United States v. Beebe, 180 U.S. at 352. The Restatement makes the same point: although "simply retaining a lawyer confers broad apparent authority on the lawyer" regarding some matters, it "does not extend to matters, such as approving a settlement, reserved for client decision...." Restatement (Third) of the Law Governing Lawyers 27 cmt. a; see also id. 27 cmt. d.
 
 
 23
 The District thinks Makins did more than just retain Harrison. It contends that she "participated in the settlement proceeding through her phone conversations with her attorney." Brief for Appellees at 23. Neither the District nor the magistrate ever heard from Makins, in person or by telephone. What the District derives from the telephone calls between Makins and Harrison amounts to nothing more than Harrison's representations of--and the District's educated guesses about--what was said in private between them, a disputed factual question the district court did not resolve.
 
 The district court found that:
 
 24
 [Harrison] had represented Makins against the District of Columbia since 1996 when he was retained before the adverse action. He then represented Ms. Makins at the time she filed her EEO complaint. Finally, he was retained to represent her in the present lawsuit which was filed in 1998.
 
 
 25
 Mem. op. at 6 (emphasis added). As we have stated, many courts hold that retaining a lawyer is not enough to confer apparent authority to settle the case. The district court also emphasized that Harrison fulfilled his duties as an attorney by filing pleadings, answering motions, and so forth. Id. at 6-7. But if we followed the majority rule, this would not be enough. The client's manifestations to the third party must be with respect to settlement, not the general conduct of the litigation. See Auvil, 92 F.3d at 230. If it were otherwise, an attorney would nearly always have apparent authority to end the case despite the wishes of his client.
 
 
 26
 It may not be crucial that the settlement conference took place before the magistrate. The District suggests that it had more reason for believing Harrison in that setting. But Harrison had a duty of truthful representation, not only to the magistrate in court, but also to the District outside the courtroom. See D.C. Rules of Prof'l Conduct R. 4.1(a). We have seen nothing in the record to prove that Harrison told the magistrate he had authority to settle the case on the terms ultimately agreed upon. Neither Harrison nor counsel for the District testified to that effect.
 
 
 27
 The district court thought the opinion of the D.C. Court of Appeals in Feltman v. Sarbov, 366 A.2d at 138-39, strongly supported the District's position. The suit was for damages arising from a lessor's breach of his attorney's oral promise to the lessee of a parking lot. The parties had entered into a written lease, with the lessee dealing exclusively with the attorney. When the lease was about to expire, the attorney convinced the lessee to renew, promising that the right of first refusal and the provision regarding the garage concession contained in the initial lease would remain in effect. Later, the attorney approached the lessee and asked him to vacate the premises, this time promising that he would get the garage concession in a new building about to be constructed. The lessor had already entered into an agreement to develop the property, thereby abrogating the lessee's right of first refusal; and when the new building was constructed, the lessee did not receive the garage concession the attorney promised. See id.
 
 
 28
 The D.C. Court of Appeals, holding that the attorney had apparent authority, sustained the award of damages to the lessee. "Apparent authority arises," the court wrote, "when a principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold. This falls short of an overt, affirmative representation by a principal," 366 A.2d at 139 (internal quotations omitted). To this the court added: "The apparent authority of an agent arises when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with authority which in fact he does not possess." Id. at 140 (internal quotations omitted). There is nothing particularly remarkable about these statements of law. They merely remind that apparent authority can arise from something other than statements of the principal, a proposition the Restatement (Second) of Agency embraces (see 27 cmt. a and 49 cmt. c). The "something other" usually consists of "the ordinary habits of persons in the locality, trade or profession"--in other words, custom and usage. See Restatement (Second) of Agency 49 cmt. c; Restatement (Third) of the Law Governing Lawyers 21 cmt. e (referring to matters ordinarily in the discretion of the lawyer). In Feltman, the court therefore relied upon the facts that the "attorney not only had drafted the lease but also handled all the negotiations with regard to its initial execution, its renewal, and its premature termination." 366 A. 2d at 140. This long course of dealing, in which the lessor held out "the attorney as the person with whom the lessee should deal," id., conferred apparent authority on the attorney.
 
 
 29
 For several reasons we are reluctant to treat Feltman as dispositive. For one thing, the case did not deal with a settlement agreement, which at least under the Restatement of the Law Governing Lawyers is in the special category of matters reserved exclusively for the client's decision. (Whether the local courts would treat settlements in this manner remains to be seen.) The Feltman court, though, placed no special emphasis on the attorney-client relationship. For another thing, Feltman rests on the several transactions between the attorney and the lessee, in the attorney's negotiating and reaching contractual agreements on behalf of the lessor. The settlement of a lawsuit, however, is typically the only contractual agreement the parties reach in litigation and one would therefore not expect to see a course of dealing of the sort present in Feltman.
 
 
 30
 Still, it may be that it is customary for lawyers in the District to enter into binding, oral settlement agreements without the opposing side receiving some manifestation of assent--orally or in writing (as in a signature on an agreement)--from the client. But the District put on no evidence to this effect and there is nothing to indicate that the District had reason to believe, from previous interactions with Makins, that certain conduct on the part of Harrison was authorized. It may also be that the D.C. Court of Appeals would decide that a client's authorizing his attorney to attend a settlement conference and negotiate on the client's behalf is, in itself, enough to confer apparent authority. See Capital Dredge & Dock Corp. v. City of Detroit, 800 F.2d at 529. But see Auvil v. Grafton Homes, Inc., 92 F.3d at 230-31; Giesel, supra, at 573-74 (citing similar cases). This would be an extension of Feltman and we are unsure whether the court would take the step.
 
 
 31
 Because of our uncertainty about whether local law supports a finding of apparent authority in this case, and because of the importance of determining when a lawyer has apparent authority to settle a case, we have decided to ask the D.C. Court of Appeals for its views. See Tidler v. Eli Lilly & Co., 851 F.2d 418, 426 (D.C. Cir. 1988); Joy v. Bell Helicopter Texitron, Inc., 999 F.2d 549, 563-64 (D.C. Cir. 1993). Pursuant to D.C. Code 11-723, the following question is certified to the D.C. Court of Appeals:
 
 
 32
 Under District of Columbia law, is a client bound by a settlement agreement negotiated by her attorney when the client has not given the attorney actual authority to settle the case on those terms but has authorized the attorney to attend a settlement conference before a magistrate judge and to negotiate on her behalf and when the attorney leads the opposing party to believe that the client has agreed to those terms?
 
 
 33
 So ordered.
 
 
 34
 Karen LeCraft Henderson, Circuit Judge, dissenting:
 
 
 35
 "The little plaintiff or defendant, who was promised a new rocking-horse when Jarndyce and Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into the other world."
 
 
 36
 --Charles Dickens, Bleak House 52 (Norman Page ed., Penguin Books 1971) (1853)
 
 
 37
 In my view, the majority has misconstrued District of Columbia (District or D.C.) agency principles and has erroneously certified a question whose answer is clear. As a result, it has further delayed the enforcement of a valid settlement agreement between the District and the appellant, Brenda E. Makins. Accordingly, and for the reasons set forth below, I dissent.
 
 
 38
 Makins makes two separate challenges to the district court's order enforcing the September 12, 2000 settlement. First, citing dicta from Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15 (1974), she contends that the district court committed reversible error by failing to determine whether she had "voluntarily and knowingly" entered into the agreement. Br. of Appellant at 10-14. Second, she argues that the district court applied the incorrect legal standard in deciding that her then-lawyer, John Harrison, had apparent authority to settle her Title VII action. See id. at 14-18.
 
 
 39
 The majority correctly rejects the first of Makins's claims. Her assertion that "settlement agreements resolving Title VII claims must be entered into 'voluntarily and knowingly' by the plaintiff before the court will find that [she] has waived [her] federally protected right to seek redress," id. at 11, is unsupported by any holding of the United States Supreme Court or of any court of appeals. Indeed, the only court to rule on the issue held that the voluntary-and-knowing standard "is not the applicable standard when reviewing a case in which the employee [seeking relief under Title VII] was represented by an attorney who settled the matter on the employee's behalf." Hayes v. Nat'l Serv. Indus., 196 F.3d 1252, 1254 n.2 (11th Cir. 1999) (emphasis added). In any case, nothing in the text of Title VII requires that settlement of a suit thereunder be entered "voluntarily and knowingly." See generally 42 U.S.C. 2000e et seq.
 
 
 40
 In addressing Makins's second claim, the majority properly adheres to the principle that "neutral state [rules] that do not undermine federal interests should be applied unless some statute (or the Constitution) authorizes the federal court to create a rule of [federal law]." Maj. op. at 7 (quoting Morgan v. South Bend Cmty. Sch. Corp., 797 F.2d 471, 475 (7th Cir. 1986)). Like the majority, I see no reason to exempt this case from the general rule that "enforcement of settlement agreements is [an issue] governed by state contract law." Maj. op. at 6. Thus, I agree that District of Columbia agency principles govern the enforceability of the settlement between the District and Makins. I dissent, however, because the majority's interpretation of those principles--and its certification to the D.C. Court of Appeals for clarification thereof--is, in a word, unsettling.
 
 
 41
 The District's certification statute states that its Court of Appeals
 
 
 42
 may answer questions of law certified to it by ... a Court of Appeals of the United States ... if there are involved in any proceeding before any such certifying court questions of law of the District of Columbia which may be determinative of the cause pending in such certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the District of Columbia Court of Appeals.
 
 
 43
 D.C. Code 11-723(a) (emphasis added). Consistent with the statute, we recently held that "[i]n deciding whether to certify a case we look to whether local law is 'genuinely uncertain' with respect to a dispositive question ... and to whether the 'case is one of extreme public importance[.]' ... If, however, there is a 'discernible path for the court to follow,' then we do not stop short of deciding the question." Dial A Car, Inc. v. Transp., Inc., 132 F.3d 743, 746 (D.C. Cir. 1998) (citations omitted). I believe the prerequisites mentioned in Dial A Car preclude us from certifying the question posed by the majority. Plainly, the issue of whether Harrison had apparent authority to bind Makins under D.C. agency principles is a "dispositive" one. And I am willing to concede, at least arguendo, that the scope of a lawyer's settlement authority is a matter of "extreme public importance." Nonetheless, I am not convinced that D.C. law is "genuinely uncertain" with respect to the question the majority certifies.
 
 
 44
 The majority believes that the extraordinarily narrow question it poses is one "about which [the D.C. Court of Appeals] has never thought." Maj. op. at 9. Of this there is probably little doubt. The certification standard under D.C. Code 11-723, however, is not whether the Court of Appeals has ruled precisely on the issue before us but simply whether its case law gives us a "discernible path ... to follow" in deciding the broader question: Under what circumstances does a lawyer have apparent authority to effect a settlement on behalf of his client?
 
 
 45
 The majority recognizes that "the D.C. Court of Appeals relies on 27 of the Restatement (Second) of Agency to determine whether an agent has the authority to enter into a binding agreement on behalf of the principal." Maj. op. at 548 (citing Sigal Constr. Corp. v. Stanbury, 586 A.2d 1204, 1219 (D.C. 1991)). And it acknowledges that, under section 27, apparent authority arises from "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [her] behalf by the person purporting to act for [her]." Id. at 9 (quoting Restatement (Second) of Agency 27 (1958)) (emphasis added). Mistakenly, however, the majority then throws in the towel, declining to decide what D.C. case law makes clear: retaining a lawyer and holding him out as the individual with whom the opposing party should negotiate is sufficient to confer apparent authority to settle the client's case.
 
 
 46
 In Feltman v. Sarbov, 366 A.2d 137 (D.C. 1976)--one of the cases upon which the district court expressly relied--the D.C. Court of Appeals declared:
 
 
 47
 Apparent authority arises when a principal places an agent "in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold. This falls short of an overt, affirmative representation by a principal." ... [That is, apparent authority] arises when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with authority which in fact he does not possess.
 
 
 48
 Id. at 139-40 (citations omitted); see also Sigal Constr. Corp., 586 A.2d at 1218-19 (same standard); Mgmt. P'ship, Inc. v. Crumlin, 423 A.2d 939, 941 (D.C. 1980) (same standard). As the majority observes, this "not[ ] particularly remarkable" pronouncement reminds us that apparent authority can be created "from something other than statements of the principal." Maj. op. at 14. Citing the Restatement (Third) of the Law Governing Lawyers--upon which, it surmises, the D.C. Court of Appeals would rely in deciding a case like this one, see id. at 10--the majority limits the "something other" to what it calls "custom and usage." Id. at 14. While custom and usage are undoubtedly factors to consider when determining the existence of apparent authority, see Crumlin, 423 A.2d at 941, the limitation is unwarranted; Feltman contemplates apparent authority if the principal merely "places an agent in a position" that reasonably suggests authority. Feltman, 366 A.2d at 139 (emphasis added); see also Crumlin, 423 A.2d at 941 (for apparent authority to attach, "it is essential that the principal have put the agent in a position where the power exercised would normally be within the reasonable scope of authority").
 
 
 49
 The majority's reluctance to accept Feltman at face value, Maj. op. at 14, is baffling. That "the case did not deal with a settlement agreement," id., does not render it inapplicable here. As Goozh v. Capitol Souvenir Co., 462 A.2d 1140 (D.C. 1983), makes clear, in the District of Columbia "settlement agreements are entitled to enforcement under general principles of contract law." Id. at 1142 (citation omitted) (emphasis added). Indeed, because D.C. "law favors the settlement of controversies," a "settlement will be enforced as any other contract." Id. (citation omitted) (emphasis added).
 
 
 50
 Furthermore, Bronson v. Borst, 404 A.2d 960 (D.C. 1979), a decision the majority cites, is consistent with Feltman and Goozh. Contrary to the majority's suggestion, Maj. op. at 8, Bronson's declaration that "regardless of the good faith of the attorney, absent specific authority, an attorney cannot accept a settlement offer on behalf of a client," Bronson, 404 A.2d at 963, leaves plenty of room for apparent authority. The statement in Bronson means nothing more than that a lawyer cannot end his client's case without either actual or apparent authority. As the majority itself explains, the Bronson litigation "was brought by the attorney against the client to enforce the settlement in order to recover his contingent fee." Maj. op at 8-9. Because "Bronson, unlike this case, did not deal with the interests of a third party who entered into the settlement with the attorney," the court simply had "no occasion ... to consider whether an opposing party could enforce a settlement agreement when the other party's attorney possessed only apparent authority." Id. at 9. In other words, Bronson is inapposite. If governing D.C. precedent were uncertain, certification and concomitant delay would be justified. But because the applicable D.C. case law--i.e., Feltman--is clear, I would decide the matter before us without further delay.
 
 
 51
 Moreover, I believe the local courts follow the Sixth Circuit's view that "when a client hires an attorney and holds him out as counsel representing him in a matter, the client clothes the attorney with apparent authority to settle claims connected with the matter." Capital Dredge & Dock Corp. v. City of Detroit, 800 F.2d 525, 530 (6th Cir. 1986) (applying Michigan law). As the District demonstrates, see Br. of Appellee at 18, the facts of Feltman bear out this analysis. In Feltman, the court found that a lawyer had apparent authority to bind his client to a lease because the lawyer had drafted the lease and "handled all the negotiations with regard to its initial execution, its renewal, and its premature termination." Feltman, 366 A.2d at 140. The lessor (i.e., the principal) argued that he had not made any express representations directly to the lessee (i.e., the third party); apparent authority attached nonetheless because the lessor "held out this attorney as the person with whom the lessee should deal." Id. Resisting this conclusion, the majority quotes from the United States Supreme Court's decision in United States v. Beebe, 180 U.S. 343, 352 (1901): "[T]he utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed." Maj. op. at 12. The D.C. court's view, however, is not inconsistent with the Supreme Court's--that is, both courts reject the Restatement's proposition that "[t]he manifestation of the principal may be made ... to a third person ... by continuously employing the agent." Restatement (Second) of Agency 8 cmt. b (emphasis added).
 
 
 52
 The majority also expresses concern that, under Feltman, "an attorney [will] nearly always have apparent authority to end the case despite the wishes of his client." Maj. op. at 1213. But "nearly always" overstates the case; whether the client has made clear her lawyer's authority by placing him in a position of authority--e.g., by sending him to a settlement conference--is only the first half of the inquiry. For apparent authority to attach, the client's manifestation must also "cause[ ] a third person to reasonably believe the principal ha[s] consented to the exercise of authority the agent purports to hold." Feltman, 366 A.2d at 139. In my view, the D.C. Court of Appeals has wisely declined to adopt a standard under which a lawyer's representation of his settlement authority is unreliable as a matter of law if the client herself has made no direct representations to opposing counsel. Such a standard, it seems to me, "would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer." Capital Dredge, 800 F.2d at 531. Indeed, such a standard could render the settlement process "unworkable." Id. at 532.
 
 
 53
 Finally, I take issue with the majority's suggestion that the location of settlement negotiations may not affect the apparent authority analysis under D.C. law. Maj. op. at 13. True, a lawyer has "a duty of truthful representation, not only to the magistrate in court, but also to the District outside the courtroom." Id. (citing D.C. Rules of Prof'l Conduct R. 4.1(a)). Yet the majority ignores the likelihood that a "solemn statement ... made in open [c]ourt ... as to the terms of the settlement," Ashley v. Atlas Mfg. Co., 7 F.R.D. 77, 77 (D.D.C. 1946), aff'd, 166 F.2d 209 (D.C. Cir. 1948), may well make more reasonable a third party's belief that the lawyer has authority to settle than would an out-of-court statement.
 
 
 54
 For the foregoing reasons, I would hold that the district court employed the proper apparent authority standard. See Makins v. Dist. of Columbia, No. CV-98-2693, mem. op. at 6 (D.D.C. Dec. 11, 2000) (quoting Crumlin, 423 A.2d at 941; Feltman, 366 A.2d at 139). Moreover, because we look only for clear error when reviewing the district court's factual findings, see Foretich v. ABC, 198 F.3d 270, 273 (D.C. Cir. 1999), I would affirm its holding that "[o]n the facts presented here ... Harrison had apparent authority to settle the case for $99,000 without job reinstatement." Makins, mem. op. at 6. The "facts presented here," as the district court found them, are as follows:
 
 
 55
 [Harrison] had represented Makins against the District of Columbia since 1996 when he was retained before the adverse action. He then represented Ms. Makins at the time she filed her EEO complaint. Finally, he was retained to represent her in the present lawsuit which was filed in 1998....
 
 
 56
 [In the present lawsuit, Harrison] carried out all the duties an attorney ordinarily carries out in terms of filing pleadings, answering motions, appearing at the pretrial after filing a complete pretrial statement, and participating in the [settlement conference] with breaks to place telephone calls to his client....
 
 
 57
 Id. at 6-7. Also, as the majority recognizes, Makins authorized Harrison "to attend [the] settlement conference before [the] magistrate judge and to negotiate on her behalf." Maj. op. at 15. In other words, under the D.C. approach, Makins "placed [Harrison] in a position" that led the District to believe he had authority to settle her case.
 
 
 58
 For at least two reasons, I am convinced the district court correctly held that that belief was reasonable. See Makins, mem. op. at 6. First, although the magistrate judge ordered the "lead attorney(s) for the parties" to appear before him at the settlement conference, he permitted the parties to absent themselves so long as they were "available by telephone for the duration of the settlement conference."* Maj. op. at 2-3 (quoting Makins v. Dist. of Columbia, No. CV-98-2693, mag. order at 2 (D.D.C. July 7, 2000)). By all outward appearances, Makins was available by telephone for the duration of the conference. Harrison, in fact, left the conference at least three times to discuss with Makins by telephone the status of the proceedings. See Makins, mem. op. at 2. The third time, he returned with telephone in hand to accept the District's offer with the new condition that Makins's forms be amended to reflect resignation instead of termination. See JA 144-45. These circumstances, taken together, reasonably suggested to the District that Makins was actively involved in the bargaining and specifically told Harrison to settle only if the District agreed to alter her forms. Second, although the majority "see[s] nothing in the record to prove that Harrison told the magistrate he had authority to settle the case on the terms ultimately agreed upon," Maj. op. at 13, I do. Before adjourning the settlement conference, the magistrate judge asked the lawyers to confirm that the terms of "the parties' agreement" were the exchange of $99,000 and the aforementioned amendment of Makins's records for dismissal of the suit with prejudice. JA 30 (emphasis added). Both Harrison and counsel for the District affirmed that those were, indeed, the terms. See id. Harrison's "solemn" representation in open court that the parties (including Makins) had that agreement bolsters the reasonableness of the District's belief that Harrison had authority to settle on Makins's behalf. Cf. Ashley, 7 F.R.D. at 77.
 
 
 59
 I would, therefore, affirm the district court's order enforcing the settlement.
 
 
 
 Notes:
 
 
 *
 The magistrate judge's order permitting availability by telephone follows the district court's rules of alternative dispute resolution:
 The Court will require, whenever possible, that representatives of the parties with authority to bind them in settlement discussion be present or available by telephone during settlement negotiations and ADR proceedings.
 LcvR, App. A, Part II, Sec. 11C (cited in Br. of Appellee at 24). Although the September 12, 2000 settlement conference was not an ADR proceeding, the magistrate judge's order supports the District's argument that its belief in Harrison's authority was reasonable because Makins's availability "by telephone rather than in person was not unusual in any way." Br. of Appellee at 24.
 
 
 
 60